May it please the court, my name is Stephanie Adraktis and I represent the petitioner Brian Sanchez. Sanchez's trial lawyer told his jury a lie, that an alibi witness, Sanchez's father Fidel, did not tell the lawyer about his alibi testimony until the beginning of trial, which was about five years after the charged murder. Because the California Court of Appeal held that counsel's conduct was professionally unreasonable, the issue in this case is whether Sanchez was prejudiced by the lawyer's false statement, and by its lawyer's failure to move to sever Sanchez's case from that of a co-defendant with a conflicting defense. Presenting false evidence against a client on trial for murder is extraordinary, but in this case, counsel's conduct was particularly damaging because the false evidence was presented to the jury as a stipulation. Ordinarily, jurors are permitted to draw their own conclusions about a witness's credibility. Because the false stipulation in the case was binding, the jury was required to accept counsel's lie as true and to discredit Fidel Sanchez's testimony, even if they had believed him. The prejudice from the false stipulation was not limited to Fidel Sanchez's testimony because it undermined the credibility of defense counsel's entire presentation. After defense counsel stipulated that his own witness had not told the truth when he testified, the jury could not have given fair consideration to any other defense evidence or even defense counsel's arguments in summation. Trial counsel personally read the false stipulation to the jury and had it admitted as a defense exhibit. Right. And counsel, so since your time is just ticking, it seems to me both of these challenged, in both ways that you've mentioned, the conduct was really grossly below that. And the California Supreme Court agreed. It fell below an objectively reasonable standard. To figure out prejudice, which is really the hang-up here on habeas, it seems like we have to reimagine this trial completely. And it's a bit of an exercise to do that. Because first of all, it would have been if his wife wouldn't have been there. And that was absolutely devastating, that she didn't join in the alibi defense. She had every reason to do so since she herself was a defendant and was looking at jail time. But she did not embrace that alibi defense, which would have put her with him off seeing a movie and having dinner and whatnot. Right. All right. So if we imagine that he had moved for severance and the case had been severed, then it seems to me the girlfriend's slash wife, we don't have that problem. He wouldn't have that problem. And he wouldn't have the problem with the defense counsel reading a stipulation into the record that so damaged defendant's father's testimony. Father's testimony was that my son was with me, basically. Right? Okay. But he still would have had what? It seems to me he still would have had, is it four witnesses to testify that Mr. Sanchez was the driver of the blue van? And, which I'd like you to address because now we're down to six minutes. And the recording of the individuals in the back of the van after they'd been arrested, or in the police car after they'd been arrested. It seems to me that those are your big problems, aren't they? Your Honor, I don't believe that that undermines our prejudice analysis at all. I mean, I was trying to get to prejudice in the comments. At all? Well, Your Honor, if one reviews, I did offer the testimony of those. It seemed pretty damning to me. Well, Your Honor, if one reads their testimony individually, their stories are completely inconsistent. Even Santos Cook and David Cook, when they testified, they were brothers. They supposedly were there the entire time together. They gave different stories about what they did that day. One of them said that they were with Sanchez all day, just hanging out. And then in the evening, they decided to go commit this murder. The other one said they got together with him right before they went out in the van to kill a rival gang member. So their stories are so completely different that it's hardly devastating to Mr. Sanchez to have them testify. They admitted over and over again that they had lied repeatedly, made up many different stories, and there's so many inconsistencies between those witnesses' statements. What about the conversation, the recorded conversation? The recorded conversation Mr. Sanchez said to Mr. Aguilar, who he was arrested with, that they needed to make up some sort of story to tell the police about why they were in the van and had the guns. And he said, I think my fingerprints are on the guns. We need to tell them that somebody... What else does a jury need to convict? That is, it's evidence that Mr. Sanchez... My fingerprints are on the gun? We have to make a story as to why we were in the van? Your Honor, if that... I might as well just have confessed right there, just said, you know, I did it and I pulled the trigger. Your Honor, there was no, no witness testified that Mr. Sanchez pulled the trigger. No witness. What the government's theory was was that he was driving the car. And didn't all the witnesses say he was driving the car, the blue van? The four witnesses who gave completely different stories every time they were asked said at trial... I'm not trying to give you a hard time, but did any of them ever waver on who was driving the van? They may have given different stories about other stuff that happened that day, but what about Mr. Sanchez driving the van? They all said that he drove the van. But, Your Honor... I'm sorry, how is that inconsistent with pulling the trigger? It only takes one hand to pull the trigger. Nobody said that Mr. Sanchez pulled the trigger. Well, nobody said it, but in the jury room, you listen to them talking about this, and they say, well, you know, the people saying that he drove the car. Well, okay, you can drive the car with your left hand and shoot with your right hand. It's not so hard. Another defendant was the one who pulled the trigger, and he was convicted of pulling the trigger of first-degree murder with the enhanced... In this trial? In this trial, another person was convicted of shooting the victim. And the jury said he pulled the trigger. They've made that finding, yes, as to the firearm allegations. Their client was convicted of second-degree? It was another person. There was no question about it that it was Mr. Fuentes who killed the victim, who pulled the trigger, who was the shooter. So, but Mr. Sanchez and Mr. Sanchez's now wife were convicted, right? They were convicted of second-degree murder, a lesser charge than Mr. Fuentes, and the jury also rejected the firearm allegation as to Mr. Sanchez. So they could not have believed that he was the shooter. They rejected that allegation. And they didn't need to, did they? They didn't need to to convict him of this crime, did they? They convicted him as an aider and a better. They believed, obviously, the testimony that he was in the van, as were Santos and David Cuck, the two witnesses. Clearly, they're... So, can I just... So the testimony against your client about this theory that they went on, and apparently the jury believed, is that it was your client's idea and that your client... To go do this crime, and his girlfriend, then girlfriend, now wife, I think she was convicted. There was testimony that she tried to... One of the guns jammed and she had fingerprints on it. She was apparently trying to help a guy shoot, but they didn't have to find that Mr. Sanchez pulled a trigger to convict him of this crime, right? There was no fingerprints found on those guns. None. Well... And also, as to whose idea was... But he's worried that his fingerprints are on the gun. He must have... He was worried that he touched... He must have handled the gun. He was worried that he touched the guns, but there were no fingerprints found on the gun. And also... That's all you need for... That's all you need to be a native, right? The witnesses admitted it was the Kuck brothers, the two government witnesses whose idea it was to go to... How would the outcome of the trial have been different? I don't understand. You've heard this Christian scenario. Now, separate trials, the wife isn't there. Her statement doesn't come in, but you got the statement where he says, you know, I've got to explain why we're in the van and how my fingerprints got on the gun, because it might be on the gun, right? So he must think he handled the gun. Because the issue before the jury was not whether Mr. Sanchez was in the van two days later, which is when he was picked up. It was whether he was driving it two days earlier during the murder, not whether he touched the guns, not whether he was there on the 8th, but whether he was there on the 6th. And he had an alibi for the 6th of September. And this lawyer completely destroyed his alibi, gave him no chance whatsoever of getting a fair hearing of his alibi before the jury. How do his fingerprints get on the gun, then? I'm sorry, Your Honor? How do his fingerprints get on the gun? Well, of course they weren't there, but he thinks they're there. He thinks they're there. He explained that James Felix, who was a government informant, had handed him and Mr. Aguilar the guns after they got into the van. So he told the jury... After they got into the van two days later? Two days later, because this van had been stolen on September 5th, and obviously these gangs were sharing the van and using it as long as they could, Mr. Sanchez said that he got into the van on the 8th. They were going to go to his school because there had been some sort of disturbance there, and he did want to get in a fight with some other individuals at school. And that James Felix, who is a government informant and also a shot caller for the Hoover Street gang, at the same time an admitted drug dealer, he handed him the guns. That's what he... Could I ask another question? There were four incidents. I think of this as four incidents. The Vendome and your clients not charged there, and in fact, arguably was the victim, almost victim of that shooting, right? Different guns. Then there's this, I'll call it the Bellevue Avenue incident. And this is August 29th? I think August 29th was the Vendome incident. Oh, forgive me. What state is this? September 6th. The next day, there's an armed robbery that your client winds up pleading guilty to. Did the jury hear anything about the guns used in that armed robbery? There was no information of the details of that incident at all. Okay, that's a no. Thank you. And then there's the stop. The vehicle was stopped. Same blue van. Stopped, and that's the fourth in my series of four incidents. And the same blue van, and that conviction was by this jury, right? It's conspiracy to go out and, you said, get in a fight. It sounded a whole lot like shoot somebody at the high school, and I'm paraphrasing there. But it's the same jury, right? They were hearing about this overarching sort of plan to expand the territory of the gang. That's why they were out in incident number one with graffiti, spraying graffiti. That's how the first shooting happened. So it's really tough. Now, when you go back to the recording in the back of the police car, it seems to me this jury has heard about all four of those incidents and the plan, and it really sounded from the evidence to me, and I want to give you a chance to respond, that Mr. Sanchez was really, that these were his idea to expand the territory of the gang, to make sure the gang was getting proper respect at the high school and whatnot. And so then you have, and the blue van used in at least incident number two, Bellevue and the high school, the same guns. That's really tough testimony for the jury to hear your client say, my fingerprints are on the straps, we've got to blame somebody else. We've got to tell him this, tell him that. What is your response to that? Clearly, Mr. Sanchez was worried about being pulled over in a stolen van and having handled these guns. Clearly, that does not in any way establish that he was driving that van when the shots were fired that killed the victim, because there were so many people involved in this. All of them had their various motivations to be involved in this gang conflict. In fact, the state's own witnesses testified that it was the Cuck brothers, two government witnesses who actually had a conflict with the Temple Street gang at the location where the shooting occurred, and it was them, they decided that's who were going to go over there and shoot. Mr. Sanchez did not have a gripe with those people. He didn't live there, and he had not been attacked by those people as Santos Cuck had been. So this was not Mr. Sanchez's fight. It was not a situation where he was directing this. On day four, when the blue van was, the stolen blue van was stopped on the way to the high school, was Mr. Sanchez driving then? He was driving it when it was stopped on the way to the high school. All right, so just one final time, if I might. Was there ever any wavering between the witnesses who testified about, okay, maybe it's two questions. Was there ever any wavering about the witnesses who testified that Mr. Sanchez was driving the van for the Bellevue Avenue incident? At trial, they said that he was driving, but they gave completely different stories on and off during the entire investigation, and they gave inconsistent statements about how they ended up in the van, why they went over there, what they were doing. It was, they did all say that he was the driver. Okay, one last question. On the day of the, is it Pacheco? Pacheco, government witness, yeah. Who supplies the guns, carries the guns out from his house. They drive the van over to the house to get the guns, and his mother, remarkably, helps carry these guns out. Was she called to testify? Did she testify about who was driving? She did not testify. Mr. Pacheco said that it was his mother who gave him the guns to give to the people in the van. And that was consistent testimony by the witness. Pacheco ended up, after the preliminary hearing, deciding to give evidence for the government and pleading to manslaughter. He admitted he was facing a life term, and he received a deal in exchange for his testimony, as all of them did. Santos and David Cuck could have served life in prison. Instead, they walked free after giving the testimony the government wanted. Thank you. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. Deputy Attorney General Jonathan Krauss on behalf of Respondent. Petitioner cannot show that he is entitled to habeas relief in this case because he can't show that the decision of the Court of Appeal denying relief was contrary to or an unreasonable application of controlling Supreme Court law. Now, indeed, as to the prejudice here, Petitioner cannot show that he was prejudiced by the admission of the stipulation or by the failure to move to sever. Now, as to the stipulation What does he have to do to show he was prejudiced? What would constitute prejudice? He would have to show ultimately what he's arguing is the case, that the admission of the stipulation gutted his case to the point where no reasonable juror would have found. But specifically, you'd have to show that there's a reasonable probability that one juror out of 12 might find this less than proof beyond a reasonable doubt. That's correct, Your Honor, and he cannot make that showing. And the reason is Well, to follow up with Judge Christen's analysis, if you had a trial in which the government's witnesses were who they were, not the most believable people, and the defense was not contradicted by his lawyer, but he put on not the most believable defense, and you had a not terribly, you'd had a prosecution with not very credible witnesses, plus a not very credible defense, you don't think it's, there's a reasonable chance that one juror might not have voted to convict? No, Your Honor, and the reason is because the evidence that was presented, though Petitioner takes issue with the credibility of the witnesses, that evidence was strong and was compelling for the jury. And to the extent Petitioner presented an alibi defense, it was very weak and implausible, such that any Was the evidence compelling? I agree, I understand that people testified, but is it compelling in the fact, in the sense that the witnesses are believable? Well, Your Honor, to the extent, again, Petitioner is challenging the credibility of these witnesses, that was a determination for the jury to make. And those witness credibility determinations are entitled to near total deference. The jury heard from these witnesses, certainly. The jury also heard everything bearing on the credibility of these witnesses. The jury heard, for example, these witnesses had given, at times, inconsistent statements. The jury heard that the witnesses were reluctant to be there, that at least one of them, Pacheco, had received a deal from them. There was no defense, though. They might have a different view of the witnesses if there were a defense. You really do have to reimagine the trial, because these two mistakes absolutely gutted his defense in this trial. I mean, the California Supreme Court really so found. These were egregious errors, right? Absolutely, absolutely. All right, so you have to just turn the page and start over. If he had had the trial, let's say if he had been able to sever his trial, so that he doesn't have the problem with his girlfriend not embracing the alibi that he was with her, and his dad testifies, my son was with me, without having the lawyer stand up and read a statement that really called that entirely into question, then how does that trial look at that point? Well, first, I'd like to make the point that Petitioner still, in order to show prejudice as far as the severance issue is concerned, he has to show the motion would have been granted. Yeah. And he really can't show that. The Court of Appeal found that it was at least possible it would have been granted. It was within the Court's discretion to grant it. But we have a good idea of what would have happened with that severance motion, given that Rossier and several of the other co-defendants did make severance motions, which were denied by the Court. So that's clue number one. The second is, as the Court of Appeal explained— But they were in a different position, right? I'm sorry, Your Honor? They were in a different position. Well, that's right. But largely, at least Rossier's motion to sever was based on the fact that her defense was she felt hurt by the defenses of the other witnesses, who placed her as more of an active participant than she claimed she was. But regardless, even if the Court— even without, I guess, recognition of what happened to Rossier's severance motion, the Court of Appeal explained that under California law, to be entitled to a severance, you must show more than just the existence of antagonistic defenses. You must show that the conflict between these two defendants is so great and that that is the only evidence that was presented against these two defendants, such that there's no way they could receive a fair trial. But the conflict doesn't get any greater. She's got her neck in the news, so to speak, as well, right? She was on trial as a defendant. And if she embraces that alibi, which is that we were together somewhere else, that's one thing. If she says, as she did— she didn't testify, but her lawyer said she was in the van. She was basically along for the ride. She was, you know, somebody's girlfriend kind of thing. How does the conflict get any more stark? Well, Your Honor, the point I would make is this, is to—if we imagine, again, the severance motion was granted, we take it to that trial, which, again, is very speculative. It's hard to know exactly what would happen. Just humor us. Okay. So pretend it's severed and then what? Here's what we know. Petitioner can't point to any evidence that was presented at the joint trial that would not have been admitted at the solo trial. We know, certainly, that counsel would not have made the argument that he did. But that wasn't evidence, of course. The evidence, such as— Sorry, which—forgive me for interrupting. Which counsel wouldn't have made which argument? Rossier's counsel would not have made the closing argument that Petitioner— He wouldn't have been there. He wouldn't have been there. That's absolutely right. But the evidence that was presented would have been the same. The evidence, again, that was based on the testimony of several witnesses who were in the van who testified that Petitioner was the driver. We also have the testimony of Pacheco, who sold the weapons, James Felix, another witness who testified about certain things that happened on the day in question. But, you know, how you evaluate the testimony of the prosecution witness would be different if there's no defense than if you have a defense. And if the defense is believed, then the prosecution's testimony might not be believed. Well, sure. But I think here's the important point about that. The prosecutor made a very compelling argument, closing argument, in regard to some of the physical and forensic evidence that supported the witness testimony. As the prosecutor pointed out, for the jury to hear that Petitioner was found in the blue stolen van that was used in the shooting with the murder weapon and with the phone used that belonged to his girlfriend's father, used on the night of the question to make calls in the area of the shooting. For the jury to hear all of that. But the phone was totally unbelievable. That wasn't helpful to me at all. The phone wasn't even the girlfriend's phone. It belonged to her dad, and it was sort of within, what, a mile or something of the shooting? It really wasn't pinpointed in the way we see in some cases. So why do I care about the phone? Well, the phone was found in Petitioner's possession. Here's why it matters. Because Petitioner's defense was that he and his girlfriend were elsewhere, that they were farther away from the shooting, that they were at his father's restaurant. If the phone made calls on the night in question in the radius of where it was pinged, then that demonstrates that the defense essentially falls apart. That's why it's compelling. It's a pretty good radius, though. In the record, I was trying to figure out, so where's the restaurant compared to where the shooting is? And that doesn't really, I didn't get much help in that regard from this record. Was the jury told about the distance between the ping and the pizza? I believe that the jury was. I happened to look it up, and I noticed that the restaurant was outside of the I just wasn't moved by that at all. So the other evidence was the witnesses in the van and the recording. Correct. Was there anybody in the van who testified that Mr. Sanchez, and they didn't just testify he was driving. They testified it was his idea, I believe. Was there anybody who testified in that subset? Was it four people? It was three people in the van who testified. The Cut Brothers and Mendez. Plus Pacheco, who wasn't in the car but had provided the guns. Did all of those guys get deals? As far as we know, Pacheco did. Pacheco took a deal early on in this process. He was initially charged with the rest, and he took a deal in exchange for his truth of testimony in this case. I'm not aware, and the record does not indicate any deals the other witnesses may have gotten. The individual who's convicted of actually pulling the trigger, first degree, is Fuentes? Fuentes, yes. And Mr. Fuentes, after he was all done with his prosecution, he was willing to say that he wasn't the driver. He wasn't there. What should we do with that? Well, Your Honor, respectfully, that was not part of the record here. It was not part of one of the appealable issues. I know it was something that the Court of Appeal weighed, the impact of the declaration. But I'm not prepared to speak on it, basically, because it didn't tie into the claims that we're dealing with here today. But it was presented in the state court. I believe, Your Honor. I think they talk about it. I think they talk about it. It probably was, Your Honor. I'm sorry. I wasn't familiar with that part. I think I interrupted you. The other forensic evidence that would have been in our make-believe trial, our do-over trial that we're hypothecating, would have been what? Okay. So, again, not only do we have his concern about the fingerprints that you noted, his conversation after the shooting, we have the fact, basically, that he was found, again, in the car, even if we throw the phone out, found in the van used in the shooting with the murder weapon. The prosecutor argued at closing, I thought very compellingly, that for the jury to hear all that and yet somehow believe that Petitioner was an innocent victim in all of that, that's not a reasonable read of the evidence that the court had before. Well, he may have been with that lawyer. I'm sorry, Your Honor? That he may have been with that lawyer he got. Well, again, I'm not defending the lawyer's conduct in some of these cases. No, but he may have been the unluckiest person in the face of the earth to get that lawyer. I've never heard of ineffective assistance that was quite that bad. Well, Your Honor, and again, respectfully, we're not contesting that counsel's performance was proficient in this case. We're merely pointing out. Proficient, extraordinary. Well, what we're pointing out here is that ultimately the evidence that was presented, even if appellant or Petitioner can take issue, Your Honor, I seem out of time. Can I finish my? No, no, please. Okay. Even if Petitioner takes issue with the credibility of the witnesses, that was entitled to deference. The jury heard that evidence. They heard all the things that made that testimony strong and even weak. They still believed it. It was supported by the forensic evidence. And the alibi defense, such as it was, was incredibly weak and implausible. This idea that he was somewhere else without any physical evidence whatsoever, ticket stubs, time cards. A year later? What teenager keeps a ticket stub from a movie for a year? Well, I understand that's the position that Petitioner takes here. However. That's a fact. No, and I understand that, Your Honor. Not even an alternate fact. No, I understand that, Your Honor. While it's, of course, true that the prosecution bore the burden here of proving the case, if the defendant, Petitioner, wanted to present this alibi defense, and if he wanted it to be believed by the court, it probably would have behooved him to provide something, anything, that would have corroborated what was otherwise a very implausible set of alibi defenses. Thank you, counsel. Thank you, Your Honors. We'll give you a minute. Thank you, Your Honor. To respond to the court's question, the Kuck brothers, David and Santos, and Dorma Mendez, got the best deal possible, which was they never got charged, even though they admitted that they were accomplices in a homicide, a first-degree murder, and could have gone to prison for the rest of their lives. There is quotations from the trial transcript in my brief where, when Mr. Santos Kuck was being questioned about how he was, how he had come by this deal, he said that the detective had told him that he wanted to help him, and that, you know, unless he wanted to go to life and to spend his life in prison and deal with the detective, he was going to have to start giving them the information they wanted. So it wasn't that the charges were dropped. It's that he was never charged. Was never charged. The three of them. Both the brothers. Both brothers and Dorma Mendez, who was Vasquez's girlfriend. But she wasn't a member of the gang. There wasn't any testimony that she was a member of the gang. She wasn't. The brothers were. But that's not required to be an accomplice in the murder. It puts her in a pretty different boat, though, whereas the brothers were, right? But she's clearly there in the van. These guns are being handed into the van. She admits. Am I right that the brothers were members of the gang? I want to make sure. Yes. Okay. They were all members of the 18th Street Gang, although the Kuck brothers were members of a different clique. You just said they were all members, but I think they weren't. I think she wasn't. They said that she wasn't a member of the gang. She was the girlfriend of a gang member. Right. And the other girlfriend. Jasmine Rossier. Was a member of the gang and was convicted. And her fingerprints were on the gun because she. Nobody's fingerprints were on the gun. Wasn't there testimony that she tried to help the gun that jammed get it unjammed? That's what the witnesses said, but that wasn't corroborated by any fingerprint evidence. Oh, it wasn't? No. Okay. Thank you. Thank you very much. Case just argued will be submitted.
judges: Reinhardt, Kozinski, Christen